**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF PENNSYLVANIA**

DOUGLAS L. MAHLER,                )
                                  )
             Plaintiff,           )
                                  )
      v.                          )          No. 2:11-cv-01610-JFC
                                  )
COMMUNITY COLLEGE OF BEAVER       )
COUNTY,                           )
                                  )
             Defendant.           )
                                  )

## MEMORANDUM OPINION

**CONTI, Chief District Judge.**

## I. Introduction

Douglas L. Mahler ("Plaintiff" or "Mahler") sued his former employer, Community

College of Beaver County ("Defendant" or "CCBC"), for discrimination based upon his age in

violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*

("ADEA"), and the Pennsylvania Human Relations Act, 43 PA.STAT. § 951 *et seq.* ("PHRA").

Presently pending before the court is CCBC's motion for summary judgment pursuant to Rule 56

of the Federal Rules of Civil Procedure. (ECF No. 69). Upon consideration of the parties'

submissions and for the reasons set forth below, CCBC's motion will be denied.

## II. Factual Background and Procedural History[1]

CCBC is a "comprehensive community college" located in Monaca, Pennsylvania, and at

all times relevant to this case, Dr. Joe Forrester ("Forrester") was the President of CCBC. (ECF

No. 97 ¶ 1). Mahler was employed by CCBC as the Director of Financial Aid ("DFA") from

---

[1]The factual background is derived from the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

approximately 1996 through June 30, 2010.  (ECF No. 16 ¶ 7).  CCBC's fiscal year ran from

July 1 to June 1 of each calendar year, and in projecting its revenue for each fiscal year, CCBC

relied on subsidies provided by Beaver County, student revenue from tuition and fees, and state

funding from the Commonwealth of Pennsylvania (the "Commonwealth").  (ECF No. 97 ¶¶ 2-3).

CCBC encountered "significant financial challenges" in developing its budget for the

2010-2011 school year.  (ECF No. 97 ¶ 6).  In 2008-2009, Pennsylvania's General Assembly

reduced funding for community colleges by 9.2% , and allocated federal "stimulus" funding to

supplant the reductions.  *Id.* ¶ 8.[2]  In October 2009, CCBC initiated its financial planning for the

2010-2011 school year in order to qualify for funding from Beaver County, whose fiscal year ran

from January to December of each calendar year.  *Id.* ¶¶ 2, 4.  CCBC assumed that the

distribution of revenues from the Commonwealth for the 2010-2011 school year would remain

constant, and that funding would remain flat for the third consecutive year.  *Id.* ¶ 9.[3]  During this

period of flat support, CCBC was experiencing record levels of enrollment.  *Id.* ¶ 11.

Faced with projections of continued flat support from the Commonwealth, record levels

of enrollment, and increased operating costs, CCBC predicted a potential deficit of

approximately $1,600,000.00 for the 2010-2011 school year.  (ECF No. 97 ¶ 12).  Forrester was

aware that, under federal legislation, stimulus money would no longer be available to CCBC in

2011-1012, and that CCBC needed to anticipate a loss in its funding from the Commonwealth of

approximately 9.2 percent once the stimulus money was no longer available.  *Id.* ¶ 13.

In light of this projected financial shortfall, CCBC began to develop strategies in

November 2009 to "clos[e] the gap" between its projected revenue and expenditures.  (ECF No.

---

[2]This 9.2 percent reduction in Commonwealth funding equated to a $441,000.00 reduction for CCBC. (ECF No. 97 ¶ 8).
[3]These projections of "flat support" were later validated by the budget recommendations made by the Governor of Pennsylvania in February 2010.  (ECF No. 97 ¶ 10).

97 ¶ 14). According to CCBC, beginning in November 2009, Forrester "engaged in [ongoing] discussions" with respect to budget development, early retirement, and "organizational restructuring" with Judy Garbinski ("Garbinski"), CCBC's Vice President of Learning and Student Success and Provost, Vice President of Finance and Operations Steven Danik ("Danik"), and Vice President of Human Resources Scott Ensworth ("Ensworth"). *Id.* ¶ 15. Ensworth testified:

> [P]robably during the fall of 2009 . . . [t]here were conversations that were held with administrators, staff union, faculty union, about the flat funding [from the Commonwealth], the deficit, not being able to produce more money, and considerations [that] need[ed] to be taken into the process . . . .

(ECF No. 72 at 34, Ensworth Dep. 93-94). These discussions were broad ranging in nature, focusing on a variety of operational areas and addressing wide-ranging topics, rather than a series of separate meetings on each budget area or each proposed budget reduction. (ECF No. 97 ¶ 18). CCBC admits, however, that the "the specifics of each meeting were not documented or chronicled." (ECF No. 74 at 30).

Conversations regarding the utilization of an early retirement incentive plan began in November 2009. (ECF N. 97 ¶ 19). Ensworth testified:

> [K]nowing that there was a large gap of available funds and budget, [Forrester] started the discussions with myself and [Danik] on an early retirement option, to see if there [were] individuals that would be interested in considering [an] early retirement option. … [I]nformation [regarding the early retirement option] was initially presented to [CCBC's Board of Trustees (the "Board")] in January [2010]. At that time[,] [the Board] did not think that there was enough information, they didn't think there [were] enough parameters, enough things in place to protect [CCBC] from that type of an [early retirement] option.

(ECF No. 72 at 34, Ensworth Dep. 94-95). CCBC's Board of Trustees (the "Board") was concerned with respect to the "exposure" CCBC would have with early retirements, because CCBC had a number of employees with over twenty years of service who were in their forties at

the time. *Id.* at 19. According to Ensworth, the Board was concerned that if CCBC did not regulate or establish parameters with respect to the early retirement option proposal, too many employees might take advantage of it, thereby exposing CCBC to understaffing issues. *Id.* at 19. The Board made it mandatory that CCBC only accept the first twenty employees who opted to participate in the still-developing early retirement proposal. *Id.*

In January 2010, CCBC requested that each cost center manager (the individuals with the responsibility for development and management of the budgets of various operational cost centers) review his or her existing budget to project savings to help address the projected budget short fall and identify the need for increased funding to support new programs or new initiatives. (ECF No. 97 ¶¶ 22-23). These managers returned requests for funding totaling approximately $1,930,061.00, which further widened the gap between projected revenue and expenditures. *Id.* ¶ 24. In reviewing the overall budget in February 2010, Forrester testified that in order to maintain the status quo with respect to the 2010-2011 school year, CCBC needed to find 1.5 million dollars in savings. (ECF No. 73 at 13, Forrester 54).

On March 15, 2010, the Board adopted a resolution approving CCBC's utilization of the early retirement incentive plans that had been developed by administration over the past several months. (ECF No. 97 ¶ 25). Generally, only those employees' whose combined age and service totaled seventy years were eligible, with the result being that any employee forty-five years old or younger was not eligible. (ECF No. 97 ¶ 166).

On March 16, 2010, Forrester issued a memorandum to the cost center managers, explaining that funding requests had exceeded projected revenue, and directed each manager to reduce their budget requests by ten percent:

I would like to tell you we have completed the budget review process and that we have a balanced budget accommodating everyone's request [for funding]. Unfortunately, that is not the case, and now, the hard work begins.

At this point, the cumulative budget request from all areas of the college exceeds projected revenue by over $2.14 million dollars. This overage does not reflect accommodation for any new initiatives, funding for new staff nor funding for new programs. Those requests would require an additional $1.9 million in funding.

We must find the ways for us to close the $2.14 million gap and find money to address some of the new initiatives being proposed. … I am requesting that you carefully review your budget request for next year and propose budget reductions representing at least 10% of the amount you have proposed. Again, the 10% reduction is to occur before we begin making any commitment to new initiatives.

[T]his is not an idle request for which you can come back and say "It's impossible, I can't do it." As a budget manager, . . . [i]t will be necessary for you to rethink the way you are currently doing business, and you will need to examine opportunities for restructuring that will reduce costs and hopefully improve productivity in your area of responsibility.

(ECF No. 75 at 19).

In April 2010, CCBC offered participation in the early retirement incentive program to all full-time employees who had "combined years of service and age totaling 70 or higher." (ECF No. 75 at 30). Plaintiff was among the eligible employees initially offered participation in the program, but he elected not to participate because he had "no intentions of retiring" at that time. (ECF No. 97 ¶ 32, ECF No. 74 at 16, Mahler Dep.). By the end of April 2010, thirteen CCBC employees opted to participate in the early retirement incentive program, but this number was insufficient to address fully the projected funding gap. (ECF No. 97 ¶¶ 34, 36). CCBC found it necessary to implement additional strategies to achieve a balanced budget. *Id.* ¶ 36.

According to CCBC, one such "additional strategy" was to restructure and eliminate positions. (ECF No. 97 ¶ 37). Ensworth testified that, in order to save money, "there w[ere] discussion[s] of reorganization of administrative positions," among which included the DFA position. (ECF No. 72 at 34, Ensworth Dep. 96). On May 10, 2010, Ensworth briefed the

Board's Human Resources Committee with respect to an organizational "restructuring plan," pursuant to which CCBC proposed the elimination of several employment positions (the "Restructuring Plan"). (ECF No. 97 ¶ 38). Under the heading "Organizational Changes," the committee's minutes reflect:

> [Ensworth] provided a briefing to the Committee regarding organizational changes that will be recommended in conjunction with recommendations on approval of the 2010-2011 budget. As part of this conversation, he identified the individuals who had retired by accepting the early retirement option previously approved by the [Board]. [Ensworth] identified which positions would be filled, those held vacant on a temporary basis, and those positions which would be permanently vacated. [Ensworth] also indicated that modifications would be made in other remaining positions and that the recommendations for approval of the budget would include the elimination of selected positions within [CCBC]. This item will be discussed in further detail with the Board at its regular meeting in May.

(ECF No. 75 at 21). While the minutes do not expressly reflect the prospective elimination of specific employment positions within CCBC, one of the "positions to be eliminated" pursuant to the Restructuring Plan "include[ed] the [elimination of the DFA] position." (ECF No. 97 ¶ 39; ECF No. 73 at 32, Ensworth Dep. 187-88).

On May 17, 2010, the Board approved the 2010-2011 budget. (ECF No. 75 at 26). The Board approved the reopening of the "time window" for the early retirement incentive program for an additional week "in conjunction with the personnel reorganization of the College." *Id.* Pursuant to the Restructuring Plan, CCBC "eliminated," *inter alia*, eight full-time positions,[4] including the DFA and Bursar positions. (ECF No. 92 at 15). On May 18, 2010, Forrester and Ensworth hand delivered a letter to Mahler, apprising him that the DFA position had been

---

[4] The eight full-time positions consisted of two "administrative" positions, two "faculty" positions, and four "staff" positions. (EF No. 97 ¶ 49).

eliminated and that CCBC did not intend to renew his employment contract for the 2010-2011 school year.[5]  (ECF No. 97 ¶ 50).  The letter provided, in pertinent part:

> As you know, development of the budget for 2010-2011 has been challenging for [CCBC], and there have been many long hours of discussion on how we can best serve the needs and interest of our students.  In finalizing the budget, we have settled on a reorganization plan that we will begin implementing with the start of the new fiscal year on July 1[,] [2010].
>
> With regrets, I must inform you that the position of Director of Financial Aid will be eliminated under the reorganizational plan and that you will not be offered an employment contract with the College for 2010-2011.  The decision to move in this direction has not been an easy decision to make, and I want you to know that elimination of the [DFA] position is not a reflection of your performance as the Director.  In the future, should you have interest in other positions that become available, your application would certainly be considered.

(ECF No. 81 at 26).  Plaintiff was sixty-four years old at the time the restructuring.  (ECF No. 97 ¶ 127).

CCBC extended the application deadline for the early retirement program for one additional week, and informed Mahler about the extension in the letter, stating:

> Earlier, [CCBC] offered an early retirement program for its employees. While you did not take advantage of the program initially, I want you to be aware that the early retirement window will be reopened for one week beginning on June 7[,] [2010].  At that time, you would be eligible to submit your request for early retirement through the Office of Human Resources Development.

(ECF No. 74 at 32; ECF No. 81 at 26).  The elimination of the DFA position became effective on July 1, 2010.  (ECF No. 97 ¶ 48).

According to CCBC, at the time the Bursar and DFA positions were eliminated, CCBC "created" a "new administrative position" entitled "Director of Student Financial Services"

---

[5]In addition, CCBC did not renew Susan Allen's contract as of June 30, 2010, as her position as assessment specialist was eliminated in accordance with the Restructuring Plan.  (ECF No. 97 ¶¶ 45-46).

("DSFS"). (ECF No. 97 ¶ 48).[6] Forrester testified that the use of technology was considered key in providing financial services to students, since CCBC was "trying to do more with less." (ECF No. 97 ¶ 94). CCBC utilized Jenzabar software, which contained several modules, such as payroll, human resources and financial aid. (ECF No. 97 ¶ 52). The financial aid module enabled users to manage and disburse financial aid. *Id.* ¶ 53. CCBC had invested approximately $2,377,697.00 in Jenzabar software, and the maintenance and training for it. *Id.* ¶ 54. In addition to Jenzabar, CCBC invested approximately $175,571.00 in Powerfaids software, a financial aid management system developed and maintained by the College Board. *Id.* ¶¶ 55-57. According to Forrester, "conversations centered on the need to increase the utilization of technology for the student financial aid program." *Id.* ¶ 96. Accordingly, the DSFS was charged with "[c]reat[ing] a technology based, integrated array of services for effective management of student financial accounts." *Id.* ¶ 95.

CCBS's faculty collective bargaining agreement generally required administrative positions to be posted. (ECF No. 97 ¶ 102). Under certain circumstances, however, CCBC could create a "special term" position, whereby the posting requirement was bypassed and the position filled by the CCBC president. *Id.* ¶ 104. Usually, a position could only be designated special term for one year and had to be posted after that period. *Id.* ¶ 105. Utilizing the special term option, Forrester appointed Davidson, the former Bursar, as the DSFS. *Id.* ¶ 51. CCBC contends that Forrester utilized the special term option because there was a sense of urgency about being ready to process financial aid with the start of the new school year looming. *Id.* ¶ 106.

---

[6]Mahler contends that the DSFS job description was not, in fact, created until after the elimination of the DFA position, pointing to the "discussion draft" for the DSFS position dated May 24, 2010, and the job description dated June 2010. (ECF No. 74 at 61-77, ECF No. 85 at 49-50 ("Discussion Draft 5/24/10")).

In selecting Davidson as the DSFS, Forrester noted that Davidson had worked with technologies, had prior experience as a director of financial aid, and had prior experience as the Bursar. (ECF No. 73 at 19, Forrester Dep. 115). Forrester testified that he felt she was the person who "brought the skill sets to the table that would be able to advance the agenda of increasing the utilization of technology." (ECF No. 97 ¶¶ 107-08). Forrester explained:

> Ms. Davidson in her role was demonstrating the use of technologies, demonstrating willingness to work with technologies, and we felt that she was in a better position to increase the utilization of the technologies that were required.

(ECF No. 73 at 19, Forrester Dep. 115-16).

According to CCBC, during Davidson's tenure as Bursar, the efficiency of managing CCBC's student accounts improved by more fully utilizing the functionality in Jenzabar. (ECF No. 97 ¶ 85). For example, the CCBC aviation students' flight accounts were automated on Jenzabar to allow students to more easily access their accounts to review their balances. *Id.* ¶ 88. Previously, this was a manual process. *Id.* Davidson worked closely with an outside agency to improve the production and distribution of 1098-T tax forms and provide students and staff online access to the information. *Id.* ¶ 89. She leveraged technology to improve the CCBC's collection process of delinquent accounts. *Id.* ¶ 90. Accounts receivable reporting was improved through the development of semester specific information on each student in order to more accurately reflect that CCBC's accounts receivable. *Id.* ¶ 91. Loan notification was also automated through Jenzabar, which had been manually done. *Id.* ¶ 92. She worked closely with the IT department on implementing the utilization of notepad in Jenzabar that allowed different departments to view notes on individual student accounts, creating better communication and service to students. *Id.* ¶ 93.

In contrast, according to CCBC, Mahler "had shown repeated and continuing resistance to utilization of the technologies that were being made available to improve the efficiency of the financial aid program." (ECF No. 73 at 19, Forrester Dep. 115). Garbinski, who served as Mahler's direct supervisor during the relevant time frame, testified:

> I would describe Mr. Mahler as a technophobe. I had numerous occasions where I was called into his office or had stopped by when he was having difficulty with the computers. He would say, I can't get on the computer, I can't pull up whatever I'm supposed to do.
>
> I would have the technician or the people from the computer center come up to check the computer. They wouldn't find problems with it. I know we had discussions on several occasions how he would have to become more of a user of the computer. He did most of his work on paper.
>
> I would come, maybe there would be an issue and the president would say, get me this information. And I would go to Doug, and he would pull out a piece of paper. His comment to me was he didn't trust the computers, he didn't trust the numbers.
>
> So he would have pieces of paper all over his desk, and we were moving into doing everything on a computer. And I just could not get him to move off square one.

(ECF No. 74 at 6, Garbinski Dep. 27). Garbinski testified that Mahler failed to utilize the computer to notify his supervisor of time off taken by him or his staff. (ECF No. 97 ¶ 61). Garbinski acknowledged, however, that she never had any disciplinary or attendance problems with Mahler, and that he "fulfilled the requirements of his job duties" during the time she was his superior. (ECF No. 74 at 6, Garbinski Dep. 26-27).

Ensworth testified that Mahler was the only employee who did not complete variance forms through Jenzabar, resulting in human resources having to adjust individual employee records "a lot of the time." *Id.* ¶ 63. One of Mahler's employees, Cindy Grimm ("Grimm"), indicated that she had been "docked" two days' pay in 2002 because Mahler had failed to properly submit her request for time off. *Id.* ¶ 68. In 2007, Grimm complained to Forrester that Mahler would not use an academic support report/program that was created for the financial aid

department by Joyce Coffman ("Coffman"), an independent consultant. *Id.* ¶ 67. In an email to a computer supplier, Coffman stated:

> I'm going to shoot straight from the hip here with you. CCBC is having trouble with F/A office. Doug Mahler hates computers and does more to work to stay away from them as possible.

(ECF No. 97 ¶ 69). Davidson observed Mahler was reluctant to use e-mail and utilized his staff to input information into Powerfaids instead of doing it himself. *Id.* ¶ 70.

Forrester heard complaints with respect to Mahler's unwillingness to use the computer and corresponding technology, and felt that Mahler was not properly utilizing the Jenzabar and Powerfaids systems. (ECF No. 97 ¶¶ 71-72). By way of example, Forrester explained that Mahler was providing handwritten notes to members of staff to enter data that he should have been able to enter directly, and that he had been given reports that were handwritten that should have been computer generated. *Id.* ¶ 73. Forrester identified a situation when he had received a handwritten note from Mahler after having requested the information in an e-mail inquiry. *Id.* ¶ 75. According to Forrester, that fact that the number was simply written down as opposed to being part of a report raised concerns about whether the information provided was accurate. *Id.* ¶ 76. Despite hearing "multiple voices" expressing concern with Mahler's lack of technical skills, Forrester acknowledged that there was no written documentation reflecting these concerns. (ECF No. 73 at 19-20, Forrester Dep. 116-17).

On February 3, 2010, CCBC received correspondence dated January 29, 2010, from the American Educational Services ("AES"), indicating that Mahler had submitted erroneous data to the agency for the 2007-2008 school year, resulting in a discrepancy in the amount of loan funds dispersed. (ECF No. 97 ¶¶ 77-78). Mahler sought assistance from Davidson in addressing the discrepancy, and using Jenzabar, she was able to arrive at a number that was closer to the amount

listed by AES. *Id.* ¶¶ 79-80. Mahler claims, however, that the discrepancy was "Janet Davidson's fault" since as the Bursar, she was responsible for reconciliation of the loan programs. (ECF No. 79 at 12). According to Davidson, the original figure was provided by Mahler, and she did not know "how [he] came up with that number originally." (ECF No. 72 at 25, Davidson Dep. 81-83).[7]

On June 9, 2010, Mahler elected to participate in the early retirement incentive program effective June 30, 2010, thereby ending his employment relationship with CCBC. (ECF No. 75 at 30-31).

Based upon the preceding events, Mahler filed a complaint on December 19, 2011, alleging that CCBC discriminated against him based upon his age, in violation of the ADEA and the PHRA. (ECF No. 1).[8] On March 5, 2012, CCBC filed a motion to dismiss Mahler's complaint (ECF No. 6), which was granted by the court without prejudice on April 25, 2012. (Minute Entry dated April 25, 2012). On May 4, 2012, Mahler filed an amended complaint. (ECF No. 16).

Presently pending before the court is CCBC's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (ECF No. 69). A supporting brief, concise statements of material facts, appendices, responses to the concise statements of material facts, reply briefs and a joint concise statement of material facts were also filed by the parties. (ECF Nos. 70-77, 79, 81-85, 87, 89, 95-97). The matter is fully briefed and ripe for disposition.

## III. Standard of Review

Federal Rule of Civil Procedure 56 provides in relevant part:

---

[7] CCBC received a similar letter from AES on February 22, 2011 for the 2008-2009 school year. (ECF No. 97 ¶ 83).

[8] In addition to allegations of age discrimination, Mahler initially alleged that CCBC discriminated against him based upon his gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Mahler is no longer pursuing that claim, and accordingly, that claim is dismissed. (ECF No. 70 at 19 n.8).

**(a) Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion. ….

**(c) Procedures.**

**(1) *Supporting Factual Positions*.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

**(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(a), (c)(1)(A), (B). The Third Circuit Court of Appeals has stated:

Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

*Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *see Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof.") (citing *Anderson*, 477 U.S. at 248; *Celotex Corp.*, 477 U.S. at 322-23).

> [W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts…. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine dispute' for trial.

*Scott v. Harris*, 550 U.S. 372, 380, (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The court must rely on the substantive law to identify which facts are material. *Abington Friends Sch.*, 480 F.3d at 256 (citing *Anderson*, 477 U.S. at 248).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party, and must draw all reasonable inferences and resolve all doubts in favor of the nonmoving party. *Doe v. Cnty. of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001); *see Woodside v. Sch. Dist of Phila. Bd. of Educ.*, 248 F.3d 129, 130 (3d Cir. 2001); *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n.3 (3d Cir. 1998).

## IV.   **Discussion**

The ADEA provides, in pertinent part:

> It shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.

29 U.S.C. § 623(a)(1). The PHRA similarly prohibits employment discrimination on the basis of age. 43 PA. STAT. § 955(a).[9] To succeed on an age-based discrimination claim, a plaintiff must

---

[9]The PHRA declares it an "unlawful discriminatory practice"

   [f]or any employer because of . . . [the] age . . . of any individual . . . to bar or to discharge from employment such individual . . . or to otherwise discriminate against such individual . . . with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual . . . is the best able and most competent to perform the services required.

demonstrate that his or her age "was the 'but-for' cause of the employer's adverse decision," *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009), and that it "'actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)). In ADEA cases where there is no direct evidence of discrimination, the Court of Appeals for the Third Circuit applies the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009) ("[T]he but-for causation standard required by *Gross* does not conflict with our continued application of the *McDonnell Douglas* paradigm in age discrimination cases.").

The *McDonnell Douglas* framework requires a plaintiff alleging age discrimination to first establish a prima facie case of discrimination. The prima facie case, the elements of which depend upon the kind of claim the plaintiff is alleging, "eliminates the most common nondiscriminatory reasons for the plaintiff's [termination]." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). In so doing, "the prima facie case 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'" *Id.* (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

---

43 PA.STAT. § 955(a). Although the PHRA is a statute of independent force under Pennsylvania law, it has generally been construed as coextensive with its federal counterparts, which includes the ADEA. *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) (citing *Chmill v. City of Pittsburgh*, 412 A.2d 860, 871 (Pa. 1980) (recognizing that "the [PHRA] should be construed in light of 'principles of fair employment law which have emerged relative to the federal [statutes]'")). For this reason, in the absence of contrary authority from Pennsylvania courts, the PHRA is construed in the same manner as its corresponding federal antidiscrimination provisions, unless the relevant statutory language indicates a different construction is warranted. *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002). For simplicity's sake, the court will address Mahler's claims solely in terms of ADEA law, but the analysis applies with equal force to his PHRA claim.

In order to establish a prima facie case for age discrimination, a plaintiff must show that: "(1) he is over 40, (2) he is qualified for the position in question, (3) he suffered an adverse employment decision, and (4) he was replaced by a sufficiently younger person to create an inference of age discrimination." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995). If the employee's position was eliminated in the context of a reduction-in-force ("RIF"), the fourth element of the prima facie case requires the plaintiff to demonstrate other similarly situated employees not in the protected class were retained. *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 301 (3d Cir. 2004); *Anderson v. CONRAIL*, 297 F.3d 242, 250 (3d Cir. 2002); *Davis v. Pittsburgh Public Schools*, 930 F. Supp. 2d 570, 600 (W.D.Pa. 2013). Otherwise, the ADEA would operate to guarantee "a protected employee a job at the expense of a sufficiently younger employee." *Anderson*, 297 F.3d at 250.[10] The Court of Appeals for the Third Circuit noted, in the context of a Title VII complaint, that "'a plaintiff whose employment position is eliminated in a corporate reorganization or work force reduction carries a heavier burden in supporting charges of discrimination than does an employee discharged for other reasons.'" *Hook v. Ernst & Young*, 28 F.3d 366, 375 (3d Cir. 1994) (quoting *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 517 (6th Cir. 1991)).

"[O]nce the employee establishes a prima facie case [of discrimination], the burden of production (i.e., of going forward) [, but not the burden of persuasion], shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employer's adverse employment decision." *Smith*, 589 F.3d at 691. The employer's burden is "relatively light," which can be

---

[10]Courts apply the *McDonnell Douglas* framework in an RIF case. *Tomasso v. Boeing Co.*, 445 F.3d 702, 707 (3d Cir. 2006). The Third Circuit Court of Appeals in *Tomasso* explained that "[i]n ordinary times, employees are fired for poor performance; in a RIF, even qualified employees are laid off in order to reduce personnel." *Id.* The court cautioned, however, that "even in a genuine RIF (one that is motivated on a programmatic level by economic concerns), individuals may not be selected for layoff on the basis of age[; rather, t]he employer must have age-neutral reasons for deciding to lay off certain employees, and the employee can challenge these reasons as pretextual." *Id.*

satisfied "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

"If the employer makes that showing, the burden of production shifts once again to the employee to establish that the employer's proffered justification for the adverse action is pretextual." *Smith*, 589 F.3d at 691. In ADEA cases, the plaintiff has the ultimate burden of proving, by a preponderance of the evidence, that age was the "but-for" cause of the challenged employer decision. *See Gross*, 557 U.S. at 177; *Smith*, 589 F.3d at 691.

As a threshold matter, the court observes that the parties appear to disagree with respect to the appropriate prima facie standard to be utilized in this case. CCBC contends that the prima facie standard for a claim of discrimination in a RIF context is the appropriate analysis, since Mahler's positon was eliminated pursuant to a restructuring plan. [ECF No. 70 at 19-20, 26]. A reduction in force situation arises when "'business considerations cause an employer to eliminate one or more positions within the [same] company.'" *Smith v. Thomas Jefferson Univ.*, Civil Action No. 05-2834, 2006 WL 1887984, at * 3 n.2 (E.D.Pa. June 29, 2006) (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990), *cert. denied*, 498 U.S. 878 (1990)). Although Mahler does not specifically articulate whether he believes this case should be analyzed as a RIF case or a typical termination case, he does argue that his position was not eliminated, and contends that the prima facie case was not met because he was replaced by Davidson, who was twenty-six years younger. [ECF No. 79 at 6].

Under either test, Mahler met his burden. Although the court recognizes that Mahler maintains that his position was not actually eliminated, even assuming that it was eliminated as a result of a RIF, he must show that CCBC retained a sufficiently younger similarly situated

employee. *Anderson*, 297 F.3d at 250. This ordinarily requires a plaintiff to point to those employees who worked in the same area and in approximately the same position. *Smith*, 2006 WL 1887984, at *3. In other words, there must be evidence that the retained employees had duties that were comparable to those of the plaintiff. *Monaco*, 359 F.3d at 305; *Anderson*, 297 F.3d at 250. If a plaintiff is in a unique position which is eliminated, however, he can establish the fourth element by "demonstrating that the remaining responsibilities of [his] position were transferred to persons outside the protected class." *Torre v. Casio, Inc.*, 42 F.3d 826, 830-31 (3d Cir. 1994); *Fabrizio v. UPMC*, Civil Action No. 10-1175, 2012 WL 3929213, at *1 (W.D.Pa. Sept. 7, 2012); *Smith*, 2006 WL 1887984, at * 3.

Here, Mahler held the position of DFA, and the summary judgment evidence does not suggest that there were other DFA positions at CCBC. It is undisputed that most, if not all, of Mahler's former DFA duties were subsumed into the DSFS position performed by Davidson. It is further undisputed that Davidson, who was twe3nty-six years younger than Mahler, was "sufficiently younger." Thus, Mahler adduced sufficient evidence to satisfy his burden with respect to the fourth prong of the prima facie case under either paradigm. Accordingly, CCBC's motion for summary judgment, to the extent it is based upon the Mahler's failure to establish a prima facie case of age discrimination will be denied.

CCBC argues that, even assuming Mahler established a prima facie case, he cannot rebut CCBC's legitimate nondiscriminatory reasons for its decision, namely, that his position was eliminated due to budget constraints and his employment contract was not renewed because Davidson was the "best candidate" to fill the newly created DSFS position based upon her proficiency in the utilization of technology. In order to defeat CCC's summary judgment motion, Mahler must point to some evidence "from which a factfinder could reasonably either

(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a . . . determinative cause of the employer's action." *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000)(reference to "motivating" was deleted because of the "but for" requirement in ADEA cases); *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 331 (3d Cir. 1995).

A plaintiff can establish the first prong by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (quoting *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)). A plaintiff may not, however, "'simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'" *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108-09 (3d Cir. 1997) (quoting *Fuentes*, 32 F.2d at 765). In other words, the plaintiff must show "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Keller*, 130 F.3d at 1109.

To satisfy the second prong, the plaintiff must point to evidence "that proves ... discrimination in the same way that critical facts are generally proved—based solely on the natural probative force of the evidence." *Keller*, 130 F.3d at 1111. The plaintiff can establish the second prong by showing that the employer in the past subjected him to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not within his class more favorably, or that the employer discriminated against other members of his protected class. *Fuentes*, 32 F.3d at 765.

In this case, Mahler first argues that CCBC's stated reasons are unworthy of credence since a reasonable jury could find that no reorganization occurred resulting in the elimination of the DFA position. In support, Mahler points to the opinion of his human resources expert, Dawn Chambers ("Chambers"), who opined that a "solid reorganization or restructure" should include the following elements:

- A review of the current structure, identifying what jobs are being combined, eliminated, or retained and a timeline.

- A listing of those employees who may be impacted.

- A review to ensure that the employees selected for termination are being selected for legal, non discriminatory reasons.

- An announcement about the restructure.

- A review of remaining positions and consideration of impacted employees.

(ECF No. 84 at 22). Chambers asserted that CCBC failed to provide documentation that any of the above steps were taken, and there was nothing to indicate a thoughtful review of the plan by CCBC. *Id.* In this regard, Chambers stated:

A restructure plan was not written, communicated, or provided to the Plaintiff. The College did not provide any detail regarding its plan, and in fact admitted that there were no notes, writings or announcements about the reorganization. Instead, the College had provided organizational charts that reflect the change in title of the DFA to the Director of Student Financial Services (DSFS).

Based on the timing of the notice to Mr. Mahler, it appears that the entire process of "restructure" happened within the eighteen days between the end of the Early Retirement Opportunity, which extended between April 1 and April 20, and the letter dated May 18, 2010, in which Mr. Mahler learned of the alleged restructure and was notified that his position would be "eliminated."

Although Mr. Mahler was promised he would be "considered in the future for other positions that become available," he was not given notice of the position of DSFS.

(ECF No. 84 at 22-23).  Based upon the information she reviewed, as well as her experience in the human resources industry, Chambers concluded that CCBC had "not engage[d] in a reorganization or restructure."  *Id.* at 23.  Chambers acknowledged in her deposition that other positions were eliminated or consolidated with other positions, but remained of the view that no restructuring occurred.  (ECF No. 47 at 59-60, Chambers Dep. 20-21, 30).

Mahler points to the opinion of his higher education financial aid expert, Betty Davis ("Davis"), who reviewed the job descriptions of the Bursar, DFA and DSFS and concluded that, aside from a change in title, the DSFS position was "essentially the same" as the previous DFA position.  (ECF No. 84 at 6).  Davis indicated that the following duties that were previously the responsibilities of the DFA were now the responsibility of the DSFS:

> \*       Ensur[ing] CCBC [was] in compliance with all regulations for the awarding and monitoring of all types of financial aid, including all institutional policies approved by the CCBC Board of Trustees;
>
> \*       Develop[ing] processes and reports to manage, award and reconcile all types of financial aid made to eligible students[;]
>
> \*       Serv[ing] as the liaison for all audits involving financial aid programs;
>
> \*       Provid[ing] guidance to students and families on financial aid options available at CCBC;
>
> \*       Supervis[ing and train[ing] all staff, including work-study students;
>
> \*       Reconcil[ing] all discrepancies involving the awarding of financial aid;
>
> \*       Prepare[ing] and manag[ing] the annual institutional budget of the office, as well as the budgets for the federal and state programs[.]

(ECF No. 84 at 6).  As support that the two positions were the same, Davis stated that the "key responsibility" for both positions was financial aid reporting, and that CCBC had designated Davidson as its designated Financial Aid Administrator, whereas it had previously designated Mahler.  *Id.* at 7.

Davis noted that Davidson acknowledged that she currently performed all the former duties of the DFA as the DSFS. (ECF No. 84 at 6). She noted that, in addition to the above duties, Davidson testified that she also performed reconciliation and was responsible for the student payment plan, but that the reconciliation duties had been the responsibility of the DFA. *Id.* Davis opined that the actual implementation of those duties was routinely associated with those functions assigned to support staff within a department, and that the inclusion or exclusion of those duties was not a material difference in the job responsibility of either position. *Id.* at p. 7.

Mahler notes that CCBC did not follow its own policies and procedures in creating the "new" DSFS position. (ECF No. 79 at 4). CCBC's policy stated that a request for a new position must originate with a member of the administrative staff, and include a complete position description, a proposed statement of qualifications for the position, recommendations for classification of the position and a statement of availability of dollars to support the position. (ECF No. 83 at 27). The position request must be reviewed by the appropriate levels within the organizational structure, and recommended to the president by the appropriate member of the president's staff. *Id.* Ensworth, however, testified that he did not know who recommended to Forrester that the DSFS position be created, and did not receive anything in writing with respect to its creation. (ECF No. 82 at 20-21, Ensworth Dep. 215-16).

As evidence that it did, in fact, engage in an organizational restructuring, Defendant points to Forrester's testimony recounting his "ongoing discussions" beginning in November 2009 with respect to budget development, early retirement, and organizational restructuring with Garbinski, Danik, and Ensworth. (ECF No. 97 ¶ 15). Forrester stated that in February 2010, he began having conversations with his staff about where they could, *inter alia*, potentially

eliminate positions and consolidate positions.  (ECF No. 73 at 13, Forrester Dep. 54-55).

According to Ensworth, by the end of April 2010 CCBC still had a major deficit since only

thirteen people had taken advantage of the early retirement incentive program.  (ECF No. 72 at

34, Ensworth Dep. 94-96).  Ensworth testified:

> There was a number of restructuring conversations that were being held.
> And they started in – there was talk in November, things need to be different,
> we're not sure we're going to be able to maintain what we have, budget doesn't
> look good from the state, we can't ask for anymore (sic) money from the county,
> in January we started to do the manager's budget process.
>
> There was discussion about consolidating, changing, revisions, but again,
> not until we rolled out the retirement in April and saw who did and who did not
> take advantage of it did they really then start to talk at the very end of April, first
> part of May of we need to continue to now look at a reorganizational restructure.

(ECF  No. 72, Ensworth Dep. 197-98).

Forrester testified that the decision to eliminate the DFA position was made in early May

2010, and Ensworth indicated that the restructuring of the DFA position was not brought to his

attention until the last part of April 2010 or the first part of May 2010.  (ECF No. 72, at 42,

Ensworth Dep. 197, ECF No. 73 at 21, Forrester Dep. 122).  Danik, however, indicated that the

decision to eliminate the DFA position could have been made in March 2010, since the

"discussions" were occurring in March 2010 and April 2010.  (ECF No. 72 at 17, Danik Dep. 35-

36).  Forrester testified that he was unable to recall who suggested that the DFA position be

eliminated.  (ECF No. 73 at 18, Forrester Dep. 112).  Garbinski, Mahler's direct supervisor,

testified that she had not recommended that the DFA position be eliminated, and was not asked

whether it should have been eliminated.  (ECF No. 83 at 38, Garbinski Dep. 49).  CCBC

acknowledges that no minutes were taken memorializing any of the meetings or discussions.

(ECF No. 72 at 17, Danik Dep. 36, ECF No. 74 at p. 30).

CCBC further disputes that the DFA and DSFS positions are the same as opined by Mahler's expert, and notes that tasks that had been previously performed by the Bursar (and were listed in the Bursar job description) and not performed by the DFA (or listed in the DFA job description) were assigned to the DSFS and listed in the DSFS job description. (ECF No. 97 ¶ 100). According to CCBC, these former Bursar duties included: preparing reports requesting drawdown funds for Pell, PHEAA and providing the amount of the drawdown; working with student accounts receivable and student payment plans; reconciling the accounts receivable accounts; and reconciling the Pell grants and direct loans to ensure that CCBC's records matched the Department of Education records. *Id.* According to Davidson, she spent approximately eighteen to twenty percent of her work time performing the duties formerly performed by her as the Bursar. (ECF No. 97 ¶ 122).

CCBC points to Davis' deposition testimony, wherein she stated that if Davidson was, in fact, performing those duties, then the positions would be materially different. As further evidence that the two positions are different, Defendant notes that the DSFS was paid at a different salary than the DFA, and the DSFS reported to the Vice-President of Finance and Operations, while the DFA had reported to the Vice-President of Learning and Student Services. (ECF No. 97 ¶¶ 98-99). Finally, CCBC notes that the emphasis on technology in the DSFS position constitutes a material difference in the two positions.

The court concludes that the evidence of record, when viewed in the light most favorable to the Mahler, raises a triable issue of fact about whether CCBC's proffered reason was pretextual. First, there is a disputed issue of fact about whether CCBC engaged in a restructuring plan. While Forrester testified that "ongoing discussions" were held over a number of months, Chambers, Mahler's expert, opined that CCBC's purported restructuring plan was not conducted

in accordance with standard human resources standards, and appeared to occur within the eighteen days between the end of the early retirement opportunity, which ended on April 30, 2010, and May 18, 2010, when Mahler was notified that his position would be eliminated. Chambers' opinion in this regard is supported by the testimony of Ensworth, who indicated that it was not until after the responses from the early retirement incentive were received did they "really" start to look at a reorganizational restructure. (ECF No. 72, Ensworth Dep. 197-198). Accordingly, a reasonable jury could conclude that CCBC's actions support an inference of age discrimination.

Even if a reasonable jury were to find that CCBC engaged in an organizational restructuring in some form or fashion, there is a material issue of fact about whether Mahler's position was, in fact, eliminated. "Whether a position has been eliminated is relevant to the issue of discrimination in a RIF case because it bears on whether the defendant's proffered justification is pretextual." *Abuan v. Level 3 Communications, Inc.*, 353 F.3d 1158, 1169 (10th Cir. 2003). A similar issue was faced by the district court in *Potoski v. Wilkes University*, 692 F. Supp. 2d 475 (M.D.Pa. 2010). In *Potoski*, six plaintiffs were employed as Public Safety Officers for the University and were terminated following the alleged elimination of their positions resulting from a reorganization of the Security Department. *Potoski*, 692 F. Supp. 2d at 478. The plaintiffs were informed during a meeting that their positions were being eliminated, but that they could apply for the "newly created" position of PSO 1. *Id.* at 480. Out of the fifteen terminated officers, only three were rehired, and all the newly hired PSO 1 officers were under the age of forty. *Id.* at 480-81. The plaintiffs' expert opined that there were no material differences between the two job descriptions, and with respect to the differences, management offered no quantitative measurable performance standards that needed to be met. *Id.* at 481. The

expert further opined that a reorganization of the department did not take place; rather, the meeting was to announce a revised job description, sever all security employees, and pronounce the opportunity to reapply for the PSO 1 position. *Id.* The defendant's expert issued a report primarily countering the plaintiffs' expert's report. *Id.*

In determining whether the defendant's proffered reason was pretextual, the court reasoned:

> Plaintiffs argue that the PSO 1 position was not newly created, but rather a "re-titled" security officer in an attempt to disguise Defendant's otherwise illegal termination. … Plaintiffs strenuously claim that this security position was never eliminated. Defendant proclaims, with equal adamance, that the security position was eliminated and the new PSO 1 was formed.

> The Tenth Circuit has stated that the "test for position elimination is not whether the responsibilities were still performed, but rather whether the responsibilities still constituted a single, distinct position." *Furr v. Seagate Technology, Inc.*, 82 F.3d 980, 988 (10th Cir.1996). The newly created PSO 1 position was very similar to the previous campus security officer position. Additionally, there were basically no differences between the purported job descriptions before and after the reorganization. …

> At his deposition, Bailey testified that there were differences between the campus security officer position and the new PSO 1. … Bailey, however, acknowledged a number of similarities between the two positions. Also, while the PSO 1 written job description may have contained additional responsibilities as compared to the security officer position, the previously labeled security officers were expected to perform the same functions contained in the new PSO 1 position. For example, as to both the old and new position, they were the lowest rank in the department, the work was autonomous, the minimum qualifications were the same, the physical requirements were the same, they were both expected to be able to run for short periods of time, and good oral and written communication skills were expected. … Indeed, the ability to ride a bike and some additional training were the only discernable differences between the positions. Even so, any training that was required for PSO 1 could be obtained within six months of gaining employment with Wilkes, and no person was tested for the ability to ride a bike. Hence, Plaintiffs have provided sufficient evidence demonstrating that the duties of the two positions were so similar that no reorganization actually occurred.

> [Defendant] relies on the Oxford Group Report, the Student Survey, and their experts' reports to justify "upgrading" to the PSO position within the

Campus Safety Department. While the evidence is probative, it does not suffice to preclude a jury from finding that Plaintiffs have discredited [Defendant's] reasons for terminating their employment, and that age discrimination was the "but for" factor in its decision.

Viewing the evidence in the light most favorable to Plaintiffs and weighing the parties' contentions, this Court finds that a reasonable jury could find that the "reorganization" defense advanced by [Defendant] is "unworthy of credence." Moreover, a jury could find that the re-designation of job titles was simply a way to replace older security officers with younger ones. *See Waldron v. SL Industries, Inc.*, 56 F.3d 491, 497 (3d Cir. 1995). Accordingly, summary judgment will be denied. …

*Potoski*, 692 F. Supp. 2d at 485-86.

Here, as in *Potoski*, the DSFS position was very similar to the DFA position. CCBC acknowledges that all of Mahler's DFA duties were assigned to Davidson in the DSFS position, and none of the DFA duties were divided or dispersed to other employees. (ECF No. 97 ¶ 156). The court recognizes that Davis testified that if Davidson performed specific Bursar duties in addition to the DSFS duties, then the positons would be materially different. Mahler disputes whether Davidson performs these functions and points to Danik's testimony, who stated that "just about all" of the Bursar's duties were actually transferred to the Controller position. (ECF No. 84 at 18, Danik Dep. 41). Thus, the division of the Bursar duties is not as "uncontroverted" as CCBC suggests. In addition, Davis considered the fact that while Davidson may perform reconciliation duties and was responsible for the student payment plan, those functions were routinely assigned to support staff within a department, and that the inclusion or exclusion of those duties was not a material difference in the job responsibility of either position. In other words, although she may have been performing those functions, they were not essential to that position.

The court is unable to conclude that the emphasis on technology compels a finding that the positions are different as a matter of law. *See e.g. Quaratino v. Tiffany & Co.*, 71 F.3d 58,

64-65 (2d Cir. 1995) (holding that whether former position had been eliminated was a question of fact that should have been determined by a jury where defendant asserted plaintiff's job was eliminated due to reorganization and combined into a higher level managerial position and alleged replacement position included "a substantial additional task" and a salary twenty percent higher than plaintiff's); *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1239-40 (10th Cir. 2002) (relying on *Quaratino* and holding that whether the defendant eliminated the plaintiff's job was a disputed issue of material fact, noting that the inquiry should not be confined to titles but should examine whether there were "actual changes in responsibility and status."). Here, a review of the two job descriptions reveals that both required knowledge of "PC and related software" and the ability to operate a "PC and related software." (ECF No. 74 at 62-63; ECF No. 83 at 45-46). The "change" in duties focused on the ability to "[c]reate[] a technology based, integrated array of services for effective management of student financial accounts." (ECF No. 74 at 61). The DFA job description, however, provided a similar charge, stating that the ability to "[p]rovide technical leadership in financial aid" was required in order to satisfactorily perform the essential duties and responsibilities of the position. (ECF No. 83 at 45-46). If a jury is persuaded that the DFA and DSFS positions were essentially the same in light of both positions requiring the utilization of technology and leadership with respect to technology, then the jury could reasonably conclude that CCBC's explanation is "unworthy of credence." *Fuentes*, 32 F.3d at 765. "While [the plaintiff] must go further to demonstrate that he was discharged *because of his age*, '[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite

persuasive.'" *Lynch v. Robertson*, Civil Action Nos. 3:2005-201, 05-211J, 2007 WL 2407276, at *21 (W.D.Pa. Aug. 20, 2007) (quoting *Reeves*, 530 U.S. at 147 (emphasis in original).[11]

Finally, Mahler contends that CCBC's failure to comply with its own internal policy governing the creation of new positions is further evidence of pretext. As previously set forth, CCBC's policy stated that a request for a new position must originate with a member of the administrative staff, and include a complete position description, a proposed statement of qualifications for the position, recommendations for classification of the position and a statement of availability of dollars to support the position. (ECF No. 83 at 27). The request must be reviewed by the appropriate levels within the organizational structure, and recommended to the president by the appropriate member of the president's staff. *Id.* Mahler points out that Ensworth testified that he did not know who recommended the creation of the DSFS position to Forrester, and did not receive anything in writing with respect to its creation. (ECF No. 82 at 20-21, Ensworth Dep. 215-16). A reasonable jury could infer from this testimony that CCBC did not act according to its policy, casting doubt on the legitimacy of its actions.

Even assuming the DFA position was eliminated pursuant to a restructuring plan, CCBC argues that Mahler cannot rebut its legitimate, nondiscriminatory reason for its selection of Davidson for the DSFS position – namely, that she was "the best candidate" to fill the position based on her proficiency in the utilization of technology. Mahler contends that he can demonstrate sufficient weaknesses, implausibilities and inconsistencies in CCBC's proffered reasons. Mahler argues that CCBC's professed emphasis on technology in the creation of the

---

[11] CCBC points to statistical evidence comparing the percentage of workers in Mahler's protected class before and after the restructuring as evidence that there was no discriminatory motive. (ECF No. 70 at 28-29). This evidence, however, does not, as a matter of law, demonstrate the absence of discriminatory motive, since Mahler claims that he was specifically discriminated against on the basis of his age.

DSFS position did not come about until after his position was eliminated, and that statements made by CCBC with respect to why he was not selected are unworthy of belief.

It is not the function of this court to determine whether CCBC business judgment in selecting another candidate over Mahler was correct. The court must view the evidence to determine whether Mahler's stated reasons for not selecting Mahler for the DSFS position could reasonably be found by a jury to be pretextual. In this regard, CCBC contends that the ability to effectively use technology was the focus of the DSFS position from the initial discussions in formulating the position, since CCBC was "trying to do more with less" and needed to better utilize the technologies available to them. The record also reflects, however, that Forrester testified that at the time the decision was made to eliminate the DFA position, the decision was initially made to transfer the DFA duties to Davidson and there were no plans to have a DSFS position at that time. (ECF No. 73 at 25, Forrester Dep. 156). Although Forrester did not recall directing Ensworth to create a Bursar job description encompassing the DFA duties, the record contains a Bursar job description dated May 2010 that does not include the emphasis on technology that was ultimately included in the DSFS job description. (ECF No. 73 at 26, Forrester Dep. 157-58; ECF No. 85 at 8).

CCBC contends that the evidence "overwhelmingly" establishes that Davidson was the best candidate to fill the DSFS position. CCBC claims that Davidson was extremely well regarded for her willingness and demonstrated ability to utilize technology, while Mahler was extremely resistant to using technology and repeatedly refused to embrace its usage during his tenure as DFA. Mahler, however, points to Garbinski's deposition testimony that Mahler had fulfilled the requirements of his job duties during the time she was his supervisor, and she never had any disciplinary problems with him. Despite Forrester's claim that others expressed concern

with Mahler's lack of technical skills, there is no written documentation memorializing these concerns, and Forrester acknowledged that Mahler's alleged shortcomings were never brought to Mahler's attention. Mahler points to Davidson's performance evaluations for 2007 and 2008, which she was rated as being "below expectations" in the area of technical knowledge. (ECF No. 77 at 13, 28). While CCBC counters that Davidson's evaluations did not reflect her performance at the time of the restructuring and her skills had improved, Forrester did not engage in any formal evaluation process for making his selection, but testified it was an "informed gut decision" based on conversations he had for which there was no documentation. (ECF No. 73 at 25, Forrester Dep. 153-54).

CCBC contends that because Forrester was in the same protected class as Mahler, this fact weakens any inference that age discrimination was the motive behind the failure to hire Mahler in the DSFS position. The Supreme Court has held, however, that "[b]ecause of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998). Therefore, this evidence would not preclude a finding that Forrester's stated reasons for his action were pretextual.

Finally, Forrester exercised his discretion and appointed Davidson to the DSFS position utilizing the "special term" option, which is an exception to CCBC's normal hiring process and does not require that the position be posted. Chambers, Mahler's human resources expert, testified that if Davidson and Mahler's jobs were being "melded," then they each should have been given the opportunity to apply for the DSFS position. (ECF No. 47 at 70, Chambers Dep. 77). Chambers opined that it appeared that the "special term" practice was utilized as a way around affording Mahler the opportunity to apply for the position. (ECF No. 84 at 23).

Viewing the evidence in the light most favorable to Mahler, the court concludes that Mahler presented sufficient evidence for a reasonable jury to conclude that CCBC's stated reason for not offering him the DSFS position was discriminatory.

## V.  Conclusion

Mahler points to evidence of record sufficient to raise a genuine issue of material fact with respect to whether CCBC's proffered reasons, namely, that his position was eliminated due to budget constraints and his employment contract was not renewed because Davidson was the "best candidate" to fill the newly created DSFS position, were not the actual reasons but the actual reason was Mahler's age.[12]  CCBC's motion for summary judgment will, therefore, be denied.

An appropriate order will be entered.

By the Court,


/s/ Joy Flowers Conti
Joy Flowers Conti
Chief United States District Judge


Dated:  August 22, 2014

---

[12]Mahler in this case does not argue pretext under the second prong of *Fuentes*.  He did not point to any evidence of record that prior to the incidents giving rise to the instant lawsuit, CCBC previously discriminated against him, discriminated against others persons within his protected class, or treated more favorably similarly situated persons not within the protected class.  In any event, having concluded that Mahler met his burden under the first prong, the court need not consider this prong.